UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> JITESH THAKKAR, <br><br> Defendant. | Case No. 18-CR-36 <br><br> Judge Robert W. Gettleman |

**DEFENDANT JITESH THAKKAR'S MOTION TO COMPEL
THE GOVERNMENT TO PRODUCE DOCUMENTS FROM THE CFTC,
U.K. FINANCIAL CONDUCT AUTHORITY, METROPOLITAN
POLICE SERVICE, AND OTHER BRITISH AUTHORITIES**

Jitesh Thakkar respectfully moves this Court for entry of an order compelling the government to produce all *Brady*, *Giglio*, and Jencks Act materials in the possession of the U.S. Commodity Futures Trading Commission ("CFTC") and to make a good faith effort to obtain and produce all such material in the possession of the U.K. Financial Conduct Authority, the Metropolitan Police Service, and other British authorities (collectively, the "U.K. entities"). In support thereof, Jitesh states as follows:

**INTRODUCTION**

Jitesh is the owner of a small software company in Chicago. He is charged with spoofing and conspiracy to commit spoofing for trades made by London-based trader Navinder Sarao using the company's software. To investigate Jitesh and Sarao, the Department of Justice ("DOJ") and FBI partnered with the CFTC in the United States and with the U.K. entities in the United Kingdom. Because those entities were part of the investigative team in this case, the government is obligated to produce *Brady, Giglio,* and Jencks Act materials in the possession of those entities.

**FACTUAL BACKGROUND**

I. <u>The CFTC Investigated Sarao's Spoofing Jointly with the Department of Justice</u>

Although it is not uncommon for federal agencies to conduct parallel investigations, occasionally federal agencies conduct *joint* investigations that are interwoven with one another like the investigation that gave rise to the charges in this case. The CFTC worked jointly with the DOJ and the FBI to investigate this case, participating in at least 20 interviews of Sarao and other witnesses. The CFTC and DOJ conducted *joint* interviews of Sarao on six different dates:

- Interviews with N. Sarao on November 8 and 9, 2016, FBI Report (Dec. 14, 2016) ("Also participating in the interview were U.S. Department of Justice (DOJ) Assistant Chief Rob Zink, DOJ Trial Attorney Michael O'Neill and Commodity Futures Trading Commission Chief Trial Attorney Jeff Le Riche.").

- Interviews with N. Sarao on February 1 and 2, 2017, FBI Report (Mar. 27, 2017) ("Also participating in the interview were U.S. Department of Justice (DOJ) Assistant Chief Rob Zink, DOJ Trial Attorney Michael O'Neill, DOJ Paralegal Kristofer Garriott and Commodity Futures Trading Commission (CFTC) Chief Trial Attorney Jeff Le Riche.").

- Interviews with N. Sarao on January 3 and 4, 2018, FBI Report (Feb. 8, 2018) ("Also participating in the interview were DOJ Trial Attorneys Michael O'Neill, Jeff Le Riche, Matthew Sullivan; DOJ Paralegal Najia Zahir; Commodity Futures Trading Commission (CFTC) Trial Attorney Thomas Simek and CFTC Investigator Allison Sizemore.").

The CFTC also joined the DOJ in interviewing at least 14 other witnesses during the investigation, including Michael Polder, Paul Denapoli, Terrence Hendershott, Matt Garley, Brian Watson, James Prince, Steve Decker, Karl Denninger, Antonios Hadjigeorgalis, Dean Payton, John Huth, Richard Schell, Hovannes Dermenchyan, and Anand Twells.[1]

---

[1] *See* FBI Report (Nov. 10, 2015) (M. Polder interview); FBI Report (Oct. 30, 2014) (P. Denapoli interview); FBI Report (Feb. 12, 2015) (T. Hendershott interview); FBI Report (Apr. 22, 2016) (M. Garley interview); FBI Report (July 27, 2016) (B. Watson interview); FBI Report (July 27, 2016) (J. Prince interview); FBI Report (June 22, 2016) (S. Decker interview); FBI Report (Oct. 3, 2016) (K. Denninger interview); FBI Report (Apr. 22, 2016) (A. Hadjigeorgalis interview); FBI Report (Oct. 24, 2016) (D. Payton interview); FBI Report (Oct. 24, 2016) (J. Huth interview); FBI Report (Oct. 24, 2016) (R. Schell interview); FBI Report (Nov. 21, 2016) (H. Dermenchyan interview); FBI Report (Sept. 28, 2016) (A. Twells interview).

Not only did the CFTC participate in interviewing Mr. Sarao and 14 other witnesses in this investigation, but the government also held the investigation out to the public as a joint investigation. On January 29, 2018, the DOJ issued a press release detailing the charges against Jitesh and others stating, "[t]he enforcement actions were announced by Acting Assistant Attorney General John P. Cronan of the Justice Department's Criminal Division, Deputy Assistant Director Chris Hacker of the FBI's Criminal Investigative Division **and Director James McDonald of the U.S. Commodity Futures Trading Commission's (CFTC) Division of Enforcement**." DOJ, Office of Public Affairs, "Eight Individuals Charged with Deceptive Trading Practices Executed on U.S. Commodities Markets" (Jan. 29, 2018), available online at https://www.justice.gov/opa/pr/eight-individuals-charged-deceptive-trading-practices-executed-us-commodities-markets (emphasis added). The press release made it clear that the investigation was a joint effort between the government and the CFTC:

> **Today's enforcement actions were led and coordinated by the Criminal Division Fraud Section's Securities and Financial Fraud Unit** and the U.S. Attorney's Office for the District of Connecticut, in conjunction with special agents from FBI Offices in New York, Chicago, Connecticut, and Houston, **and with invaluable assistance from** the Fraud Section's partners at the U.S. Attorney's Office for the Northern District of Illinois, the U.S. Attorney's Office for the Southern District of Texas, the U.S. Postal Inspection Service and **the CFTC's Division of Enforcement**.

*Id.* (emphasis added). In fact, the CFTC filed a civil complaint against Jitesh for the same conduct at issue in this case only nine days after the DOJ filed its criminal indictment, indicating additional coordination between the DOJ and the CFTC. *See* Criminal Complaint, *United States v. Thakkar*, 18-cr-36 (N.D. Ill. Jan. 19, 2018); Complaint, *CFTC v. Thakkar, et al.*, 18-cv-619 (N.D. Ill. Jan. 28, 2018).

It is indisputable that the CFTC worked jointly with the DOJ and FBI in the factual investigation into this matter.

II. The United Kingdom Financial Conduct Authority, Metropolitan Police Service, and Other British Authorities Also Were Part of the Investigation with the DOJ.

To investigate this case, the DOJ also partnered with the United Kingdom Financial Conduct Authority and the Metropolitan Police Service to investigate Sarao, arrest Sarao, and search and collect evidence from Sarao's residence. The Financial Conduct Authority sent questionnaires to Sarao as part of the investigation into his trading activity, and it worked with the Metropolitan Police to arrest him. *See* J. Quinn & G. Rayner, Telegraph (Apr. 22, 2015), available online at https://www.telegraph.co.uk/finance/financial-crime/11553433/British-trader-Nav-Sarao-charged-with-triggering-global-markets-flash-crash-in-2010.html ("As part of the investigation in to his activities, the UK's Financial Conduct Authority sent Mr Sarao a questionnaire in May 2014"); *id.* ("The charges have only came to light now, however, following his arrest by the Metropolitan Police on April 21, working in conjunction with the British regulator, the Financial Conduct Authority."); J. Hall, "British trader Navinder Singh Sarao arrested and charged over 2010 'flash crash,'" City A.M. (Apr. 21, 2015), available online at http://www.cityam.com/214178/british-trader-navinder-singh-sarao-arrested-and-charged-causing-2010-flash-crash ("The US is seeking extradition for 37-year-old Sarao after he was arrested by the Metropolitan Police working with the Financial Conduct Authority (FCA) at his Hounslow home in west London on Tuesday."). Further, the Metropolitan Police acknowledged to reporters that it was *acting on behalf of U.S. authorities*. NBC News, "Navinder Singh Sarao, Trader Linked to 2010 'Flash Crash,' Appears in Court" (Apr. 22, 2015), available online at https://www.nbcnews.com/business/markets/navinder-singh-sarao-trader-accused-2010-flash-crash-appears-court-n346116 ("Sarao was arrested in the Hounslow area of West London on Tuesday, according to the Metropolitan Police, which said its officers were acting on behalf of U.S. officials."). The CFTC itself thanked both the U.K. Financial Conduct Authority and the

Metropolitan Police for aiding in the investigation, as well as another U.K. entity called the Guernsey Financial Services Commission. CFTC, Press Release No. 7486-16, "Federal Court in Chicago Orders U.K. Resident Navinder Singh Sarao to Pay More than $38 Million in Monetary Sanctions for Price Manipulation and Spoofing" (Nov. 17, 2016), available online at https://www.cftc.gov/PressRoom/PressReleases/pr7486-16 ("The CFTC thanks and acknowledges the assistance of the Chicago Mercantile Exchange, the U.S. Department of Justice, the Federal Bureau of Investigation, the U.K. Financial Conduct Authority, the Guernsey Financial Services Commission, and the Metropolitan Police International Assistance Unit, Scotland Yard.").

Thus, the DOJ and CFTC clearly worked with the U.K. Financial Conduct Authority, Metropolitan Police, and other U.K. authorities to in investigating and extraditing Sarao.

### III. The Government Refused to Produce Documents from the CFTC or U.K. Entities.

Given the CFTC and U.K. entities' involvement in the investigation of this case, Jitesh requested that the government produce all *Brady*, *Giglio*, and Jencks Act materials in the possession of the CFTC and the U.K. entities on multiple occasions. Despite the government's partnership with the CFTC and the U.K. entities, and despite the case law discussed below, the government has taken the position that those organizations "are not, and never have been, part of the prosecution team." On that ground, the government refused to produce documents within the possession of those entities.[2] Jitesh brings this motion to compel the government to produce materials in the possession of the CFTC and the U.K. entities.

---

[2] The government has stated that it has produced materials within its own possession that it received from the CFTC and U.K. entities. As discussed in more detail below, that is not sufficient to meet the government's obligations under *Brady*, *Giglio*, and the Jencks Act.

**ARGUMENT**

As the government has recognized, "[t]he discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)." D. Ogden, Deputy Attorney General, Memorandum for Department Prosecutors re Guidance for Department Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), available online at https://www.justice.gov/archives/dag/memorandum-department-prosecutors. "*Brady* requires disclosure of evidence material to guilt or punishment and *Giglio* requires disclosure of evidence tending to impeach a government witness that is material to the outcome of the trial." *U.S. v. Sims*, 808 F. Supp. 607, 615 (N.D. Ill. 1992). "[T]he Jencks Act provides that, in a criminal prosecution brought by the United States, after a witness called by the federal prosecutor has testified on direct examination, the district court, on motion of the defendant, shall order the United States to produce any 'statement or report' as defined by the Act in the possession of the United States that relates to the subject matter as to which the witness has testified." *United States v. Allen*, 798 F.2d 985, 992-93 (7th Cir. 1986). Thus, between *Brady*, *Giglio*, and the Jencks Act, the government must produce a wide range of exculpatory materials to the defense.

I.  The Government Must Produce Exculpatory Materials in the CFTC's Possession.

The government's obligation to produce exculpatory materials is not limited to documents within its possession. Courts have held that the government also must produce exculpatory material in the hands of agencies that work with the government during a criminal investigation. For example, in *United States v. Gupta*, a defendant accused of insider trading argued he was entitled to certain documents from the SEC that contained exculpatory information. *Gupta,* 848 F. Supp. 2d 491, 492-93 (S.D.N.Y. 2012). The court held that the U.S. Attorney's Office was

required to review documents in the possession of the SEC for *Brady* material. *Id*. at 493. Citing Supreme Court precedent, the court found that "the prosecutor 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

The government argued in *Gupta* that it had no obligation to review the SEC's materials for *Brady* information. *Id.* at 493. It maintained that the SEC was not a member of the joint prosecution team, that the U.S. attorneys and SEC attorneys made independent decisions, that they did not have control over each other's actions, and that the United States Attorney's Office conducted most of their investigations without the SEC being involved. *Id*. at 494. The court rejected that argument, finding that agencies who engage in joint fact gathering are bound to disclose exculpatory material:

> [W]hen it comes to *Brady* disclosures, the relevant context is one of fact-gathering, not charging determinations or otherwise. **For *Brady* purposes, it is enough that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions**, because the purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-gathering that might not otherwise be available to the defendant.

*Id.* at 494 (emphasis added). As the court put it, "[t]hat separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense; but that they can then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all." *Id.* at 492. In fact, "any argument that the Government's duty does not extend so far merely because another agency, not the [U.S. Attorney's Office], is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.'" *Id.* at 493 (quoting *United States v. Shakur*, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)). Thus, it does not matter whether the government and

an agency engage in a joint prosecution. All that is necessary to trigger the government's *Brady* obligation is a joint investigation:

> [J]oint fact-gathering is part of what is often referred to as 'joint investigation,' triggering a *Brady* obligation, even if it is not a 'joint prosecution.' Factors that the Government here emphasizes, such as the independence of the two agencies' 'charging decisions' and trial strategy, may show that this is not a 'joint prosecution,' but they have no bearing on joint collection of exculpatory information that *Brady* compels the prosecutor to disclose. For purposes of *Brady*, how the agencies use the facts discovered jointly is irrelevant, and the joint investigation need not result in a joint prosecution. And where the investigation is conducted jointly, the Government is charged with reviewing all documents and information connected to that joint investigation and disclosing any exculpatory information.

*Id.* at 494-95.

A similar conclusion was reached in *U.S. v. Burnside*, 824 F. Supp. 1215 (N.D. Ill. 1993). In *Burnside*, the government argued that it was not required to disclose under *Brady* and *Giglio* certain exculpatory information that was in the hands of other government agencies. *Id.* at 1256. The government asserted that *Brady* applied only to evidence possessed by the "prosecution team" and did not reach evidence possessed by government agencies. *Id.* at 1251, 1256. The court rejected that argument, finding it "both factually and legally erroneous." *Id.* at 1251. It found that "*Brady* information was also known to the ATF case agents, the Chicago police officers working on the case, the [Warden at the prison where witnesses were housed], and other government personnel who were involved with the [ ] cases as a result of their responsibilities in dealing with the government's cooperating [ ] inmate witnesses." *Id.* at 1252. It held that "[t]he knowledge of these government employees, as well as knowledge of facts that were readily available to government personnel, is imputed to the government under the law." *Id.*

In reaching its decision, the *Burnside* court relied on a Seventh Circuit case, *United States ex rel. Smith v. Fairman,* 769 F.2d 386 (7th Cir. 1985). In *Smith*, a police ballistics expert

possessed *Brady* material, and the court held that the government had an obligation to produce that material. *Burnside*, 824 F. Supp. at 1253. It stated, "[w]e believe that the purposes of *Brady* would not be served by allowing material exculpatory evidence to be withheld simply because the police, rather than the prosecutors, are responsible for the nondisclosure." *Smith*, 769 F.2d at 391-92. The *Burnside* court relied on *Smith* to hold that the undisclosed material in that case could be "attributed to the government for *Brady* purposes since much of the undisclosed *Brady* material was possessed by the Warden and other personnel in the [prison] in Chicago and was 'readily available' to the U.S. Attorney's Office for the asking." *Burnside*, 824 F. Supp. at 1254. "'[T]here is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities.'" *Id.* (quoting *United States v. Deutsch,* 475 F.2d 55, 57 (5th Cir. 1973), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984)).

Nor can the government attempt to shield exculpatory evidence by asserting that other arms of the government are not part of the "prosecution team." This argument was rejected in *Burnside* as a misunderstanding of prior rulings:

> [T]he concept that the *Brady* obligation encompassed the entire 'prosecution team' was not enunciated as a means by which the government could narrow its *Brady* obligations. The concept was created as a judicial response to erroneous arguments by government counsel seeking to avoid the determination that a *Brady* violation had occurred in instances where the prosecutors' offices were unaware of suppressed *Brady* evidence *Brady* that was known to other persons involved in the prosecution's efforts.
>
> * * *
>
> The 'prosecutorial team' concept does not, however, relieve the government of its duty to inquire about *Brady* information when the known facts warrant further inquiry into facts readily available.

*Id.* at 1257. The court then cited a holding by the Fifth Circuit which "'decline[d] to draw a distinction between different agencies under the same government, focusing instead upon the

- 9 -

'prosecution team' which includes both investigative and prosecutorial personnel.'" *Id.* at 1257-58 (quoting *United States v. Auten,* 632 F.2d 478, 481 (5th Cir. 1980)) (additional quotation marks and citations omitted). Relying on this authority, the *Burnside* court held that the prosecution was obligated to disclose exculpatory information possessed by other government entities:

> The problem here was not the availability of sources for the *Brady* information. The problem was that the U.S. Attorney's Office personnel did not investigate, did not inquire, and did not request further drug testing. Personnel of the U.S. Attorney's Office had the power, authority and means to obtain much of the *Brady* information the government now disclaims. To draw artificial barriers, based on the government's self-willed prosecutorial ignorance, would, in this case, encourage 'the ostrich' approach, would reward 'conduct unworthy of the United States Attorney's Office,' *Perdomo,* 929 F.2d at 970–71, and would deny the defendants the due process of law which *Brady* and its progeny were crafted to preserve.

*Id.* at 1258. *See also United States v. Andrews*, 824 F. Supp. 1273, 1289-90 (N.D. Ill. 1993) (holding that government was required to produce *Brady* evidence in the hands of government agencies, specifically the Chicago Metropolitan Correctional Center, ATF, and the DOJ's Witness Security Program).

Here, as discussed above, it is clear that the government engaged in a joint investigation with the CFTC. The government conducted interviews of 15 witnesses as part of a joint fact-gathering process with the CFTC. The government is thus obligated to review all CFTC documents with information connected to that joint investigation and to disclose any potentially exculpatory information.[3] *See also United States v. Quintantilla*, 760 F. Supp. 687, 697 (N.D. Ill.

---

[3] The *Gupta* court also held that the government could not avoid its *Brady* obligation to review and disclose exculpatory information in the SEC's possession by producing the government's own notes and reports from the investigation:

> *Brady,* however, requires more than assuming that no new exculpatory information will be found. There is no transcript that serves as a complete and accurate record of what was said at these interviews. The SEC attorney may have chosen to emphasize other parts of the witness interviews in his memoranda that did not make it into the FBI agent's notes, or that the Government attorneys present simply forgot, and those may

1991) (holding that government would be required to produce *Brady* and *Giglio* material contained in "federal and state agency files on its witnesses").

    II.    <u>The Government Must Make a Good Faith Effort to Produce Materials from the U.K. Financial Conduct Authority, Metropolitan Police Service, and other British Authorities.</u>

Courts have held that, with respect to foreign agencies, the government must make a good faith effort to obtain exculpatory evidence in the possession of those agencies. *See United States v. Yousef*, 327 F.3d 56, 130 (2d Cir. 2003) (finding that, where there is a joint investigation with foreign agencies, to comply with the Jencks Act, U.S. officials should make "a good-faith effort to obtain the statements of prosecution witnesses in the possession of the foreign government") (internal quotation marks and citations omitted.). *See also United States v. Karake*, 281 F. Supp. 2d 302, 306 n.2 (D.D.C. 2003) (holding that the government was expected to produce certain exculpatory information "in its possession, custody, or control, and that it will use its good faith efforts to obtain [such exculpatory] information from foreign entities"). Thus, the government cannot flatly refuse to produce *Brady*, *Giglio* and Jencks Act evidence in the hands of the U.K. entities that participated in the investigation, arrest, and extradition. It is required to make a good faith effort to obtain such materials.

## CONCLUSION

For these reasons, Defendant Jitesh Thakkar respectfully requests that this Court grant his motion, compel the government to produce all *Brady*, *Giglio*, and Jencks Act materials in the possession of the CFTC, and to make a good faith effort to obtain and produce all such materials in the possession of the United Kingdom Financial Conduct Authority, Metropolitan Police

---

qualify as *Brady* material. Thus, the Court directs the Government to promptly review the SEC's memoranda for any additional *Brady* material, and if there be such, to disclose it to the defense. *Gupta,* 848 F. Supp. 2d at 495.

Service, and other British authorities, and to grant such other and further relief as this Court deems appropriate.

Dated: February 22, 2019

Respectfully submitted,

By: /s/ *Renato Mariotti*
    Renato Mariotti
    Holly H. Campbell
    THOMPSON COBURN LLP
    55 East Monroe St., 37th Floor
    Chicago, Illinois 60603
    (312) 346-7500
    rmariotti@thompsoncoburn.com
    hcampbell@thompsoncoburn.com

    *Attorneys for Jitesh Thakkar*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2019, the foregoing was filed electronically with the Clerk of the Court to be served upon all attorneys of record by operation of the Court's electronic filing system.

/s/ *Renato Mariotti*